Yes, good morning, Your Honors. Paul Kevin Wood for Petitioner Varouj Manasian. If it may please the Court, the IJ, of course, found that Mr. Manasian had failed to establish a well-founded fear of future persecution for him to be returned to Armenia. But this, of course, is what Mr. Manasian was testifying to when he was cut short by the IJ, who said, and I quote, Let's go ahead and next question. Mr. Manasian therefore argues he was not provided a full and fair hearing because his testimony was truncated and he was not able to rebut the IJ's conclusion without really factual support that changed country conditions apply here. Therefore, Petitioner argues that in this particular instance, no deference should be given to the immigration judge's decision and factual determinations because a reasonable adjudicator would have permitted Mr. Manasian to finish his testimony and provide all the evidence he had in his favor. We also argue a reasonable adjudicator would have made an individualized analysis of Mr. Manasian's potential for future persecution instead of merely relying upon the 2003 State Department country condition reports. In fact, we think that not only did the IJ fail to make an individualized analysis, but the IJ, in fact, misread the 2003 report upon which he ostensibly relied because this report sets forth that hundreds of government protesters and opponents were detained and harassed and fined without hearing. Of course, the 2005 country condition reports that we cited in our brief set forth that this practice continued and, in fact, political prisoners were, in fact, and government opponents were, in fact, still beaten while in custody. What do we do with, and I think this is a prior question, the adverse credibility finding? Well, Your Honor, excellent question. I believe that the IJ did not sufficiently permit Mr. Manasian once again to explain his prior arrest. The moment he tried to explain that he had had community service, he was once again cut off. I might also add that Mr. Manasian still does not have complete. No prior arrests. You're now referring to the solicitation arrests? Yes. Yes, Your Honor. I'm referring to adverse credibility finding with respect to what happened to him before he came to this country, the basis for his asylum claim. Yes. Yes, Your Honor. And once again, I don't think the IJ's decision is reasonable. I think that the asylum application does not in any way conflict with his later testimony at the hearing, even though that testimony was, of course, truncated and cut short. Well, if you would read number 36, the question asked on the form, it's at AR 259. The question asks, have you ever been detained, interrogated, convicted, and sentenced to imprisonment in any country? He checks no. That sounds like a direct conflict with the testimony he's now trying to give, which is to say that he was arrested twice. And once again, I think the problem is the IJ did not give any consideration to Mr. Manassi's explanation. He spoke, as Mr. Manassi testified, perhaps 20 words of English, if that, when this was done. This was translated by someone else who wasn't fluent in English as well. And I understand that he provided more testimony at the later hearing, but I think the gist of his application, which is that he opposed the government. He wanted greater independence from Russia, and he translated the Armenia for Armenians' movement. I think the gist of that is found in his application. Now, obviously, with the language barrier, he didn't provide all the details. He provided more details at his hearing. But I don't see the conflict there, and I do think the... Well, if I put to one side, for purposes of the question, your point, which is a good one, that he has difficulty with English. But if you're assuming he understood the question that was asked, the answer he gave directly contradicts his later evidence. That is to say, have you ever been detained? He says no. Well, he was, and the basis for his asylum claim is he was arrested twice. I think if we defined detention as formally detained, as in formally charged, the answer would be yes. But once again, we have a language issue. We also have the issue of the fact that he was detained, but he wasn't formally detained. He was part of a political group that basically they took into custody. The first time, I think it was four hours. He continued to the second time they detained people, and this was the time he was actually beaten and suffered and needed medical treatment. That was 18 hours. But in neither event was he formally arrested or charged. So I could see someone, especially with someone having someone translate for you, could define that as being arrested. And he was not arrested or formally detained. He was informally detained. And, of course, that's what you do when you want to beat up your political opponents. You don't actually have sort of a trial we have here, of course, in the United States. No, I get that. And, of course, the statement that he does make, in answer to 35, I participated in anti-Soviet rallies. I was told on several occasions that if I don't stop, I will be arrested and that I am watched. Of course, the IJ then does focus on that and says, well, will be is very different from have been. And if you're capable of sort of mentioning arrests, if there's enough language and understanding to say that, and if this is an asylum application, how do we get to disregard the IJ's conclusion? I understand that different IJs may have different responses to this. But why is this not substantial evidence upon which the IJ is entitled to rely? Well, I would give you two things to focus on. The first is the language barrier. And so, once again, he's talking about he would be arrested. It doesn't mean he wasn't informally detained in the past. And I think that's a nuance that obviously this court, being so much more sophisticated, wouldn't understand. But someone who doesn't speak English fluently wouldn't. But I also think it's pertinent that on so many different occasions, if you read through the IJ, cut off his testimony did not permit him to have a full and fair hearing. One of the difficulties is that on pages approximately 47 and 48 of the IJ opinion, is that the IJ walks through the bases for the lack of credibility finding. And while you offer a plausible explanation, there is evidence to support the IJ's findings. So we're kind of placed in a situation where our standard of review is so high in terms of deference. And then, apart from the arrest question, the IJ goes on to say that it was incredible when he didn't even mention that he'd been arrested or beaten. And he said, well, he couldn't remember what he told them. And then the judge says, well, that seems to be incredible. And then goes on for other evasive and incredible. So if you add all that up, you can see the hurdle both that you face and that we face as a reviewing court. Do you have any case that would suggest you could overcome that hurdle on credibility? You know, the cases we cited in our brief about the fact that someone is entitled to a full and fair hearing, the record you have does provide some comments by the IJ. But at the same time, the IJ's comments are based upon, once again, the testimony of my client, who was not permitted to complete his testimony on these issues. I mean, the IJ obviously conducted this hearing in a very rushed fashion, did not permit all the questioning that counsel for petitioner wanted to do. And as I said, he said, let's go ahead. He said, next question. I also think if you read the IJ's opinion and his comments at the hearing, I think he really did hang his hat to a large degree on the 2003 country conditions report. And he's entitled to, except I think he misread that. I think that as the 2003 report sets forth, the conditions had not changed for political opponents. I think he just misread the report or didn't read it quickly. I understand the press of business. The IJ has probably worked a lot harder than I do. But at the same time, that really is an excuse in terms of actually getting, you know, what this court has said that petitioner is entitled to, which is a, quote, individualized analysis, end quote. Just relying on a 2003 report without really even reading it, when it actually does set forth that political opponents are still being harassed, et cetera, really doesn't form the sort of record that I think this honorable court should give deference to. And on that square, I might note that we have not only cited to the 2005 country conditions report in our brief, as I'm sure your honors are aware, but that the 2003 country conditions report on human rights practices in Armenia, which for obvious reasons neither party has cited to, this case being so old, sets forth that there still is persecution of political opponents in Armenia. In the executive summary of this report, it talks about how there are allegations of torture. It talks about how police routinely beat citizens during arrests and interrogation. And I think this is key, and it says basically, quote, authorities continue to arrest and detain criminal suspects without reasonable suspicion and to detain individuals arbitrarily due to their opposition, political affiliations, or political activities, end quote. So I think that the country conditions report, especially when you aggregate the 2003, the 2005, and the 2011 reports, paint a much different picture from the IJ's cursory analysis. And I'm quite frankly, I'm not ‑‑ I can't really explain how he got the conclusion out of the 2003 report that he did. Well, thank you very much, Your Honor. Good morning, Your Honors. May it please the Court, and I'll ask for the scores for Respondent Eric Holder. I'd like to address first the fact that while the immigration judge did curtail the testimony, no one has indicated what he was prevented from testifying to. If there's no indication as to what he would have testified to that would have possibly changed the outcome of the hearing, then there's no prejudice, and he has not identified any information. Well, how much time was spent during the hearing? Well, Your Honor, this went on for over four years, from first immigration judge hearing to the last, during which his wife was granted cancellation of removal in order to take care of her mother. That was part of the hearing. The rest of it, he had more than four years to prepare. It was given continuance after continuance. The immigration judge was correct in wanting a fairly concise ‑‑ How long did the hearing? We don't have times on it, Your Honor. It just goes by date. It doesn't say it's now 10 o'clock and it ends at 1 o'clock. Well, I just asked you that. I didn't ask about four years and all that. Okay. Well, I can't tell you how long it was then. I understand we don't have time. How many pages did the hearing take, during which he presented his own evidence? Well, over 100, Your Honor. Yeah, okay. And, again, there were some of the fundamental information was taken and recorded at earlier hearings. But at this one, the hearing, do you want me to get you the number now? No, it's okay. Okay. But, you know, there were several hundred pages of testimony at this hearing. I don't remember exactly how many and how many specifically to the asylum claim. I think specifically as to his asylum claim, we're not talking 100 pages. But I read the transcript. Okay. One of the puzzling things about this case is the government just drops the ball for a long time. How come? What happened? This was not a priority case. At the time that he had – Would you run through the timeline? He applies for asylum timely. He's clearly within the one-year bar. Oh, the one-year bar. This was way before that came into effect. Yeah, yeah. And then the government institutes proceedings how many years later? Well, we don't know because we don't know when the asylum hearing was. But, yes, it was a good amount of time. Like how many? Well, between the time he filed his application and the time the notice to appear was issued was about eight years. So what's going on? I have no answer for that, Your Honor, except that, as you know, proceedings are commenced in the unreviewable discretion of the Attorney General. And at that point, this was the priority that was given to this case. Now, ordinarily, this might work to the advantage of the asylum seeker. If we get past the adverse credibility problem, which is a very real problem, but if we were to get past that, what bothers me about this case is the changed country conditions. Well, the country conditions are better for him now, but in part because the government took so long to do the case. Had the government been prompt about this, I'm not sure they would have anything like the same country conditions of defense they now have. Well, that's, Your Honor, speculation. If this hearing had taken place in 1996, possibly. Well, no, it's not speculation, meaning we know what happened in terms of when the conditions changed. So that's not speculation at all. We know that the government delayed this long period. We know that conditions in Armenia changed during this long period. Well, the major change took him at the time that he filed his asylum application, and, in fact, he said he was saying he advocated for the overthrow of the Soviet Union. The Soviet Union was overthrown. Even if they approved it immediately, as soon as that happened in 1992, his asylum claim became weaker. But, you know, what bothers me is that he's here. When did this start? When did these proceedings start? In 2000. What year? 2000. Are you sure? I'm pretty sure. Haven't you known the date? Yes, February 24, 2000. And then it took eight years. Yes. And is his wife still here? You know, 2000, the application form from which I read, I think I got the date right, he signs that in 91. Where's your 2000 coming from? Oh, that's when the notice to appear was filed. I'm sorry, I thought that was the question. So we have about eight years from the asylum application to the notice to appear, and then we have another 12 years since, and that has not been the delay of the government. So, you know, we're balancing out here. Why do we have 12 years since? Administrative delays took up several years, the notice of appeal, the motion to reopen, and then it has an 06 docket number. So we've got almost 20 years. It is. Yeah. And the wife's still here? She's a citizen now. She's a citizen now. And he has been considered three times for the favorable exercise of prosecutorial discretion, but unfortunately he doesn't qualify because he's inadmissible because of the two crimes involving moral turpitude. He has not sought to overturn them, he has not sought a waiver, and he has not challenged the finding of inadmissibility. So in any event, he still cannot adjust status. I mean, he's legally barred from doing so. He needs either to have the convictions overturned, and that might not affect it, and he needs a waiver, and he hasn't applied for one. So, I mean, the delay here is things that are left undone, and it has been sitting in this Court for six years, and it has been considered for prosecutorial discretion, but he's inadmissible. So if you were sitting down with Mr. Wood, what would you tell him he needed to do in order to keep his client here in this country? At this point, there is no legal way for him to do so, Your Honor. There has to be. Perhaps if Your Honor can tell me what it is. I have been over it several times with my client, and he is inadmissible. He can try to seek a 212-H waiver. Now, Mr. Wood has only done the appellate part. He's not that familiar with the immigration proceedings. Mr. Manassian has a separate attorney for that, and he should have been the one to seek a 212-H waiver. Who is his attorney? I don't know. I've only dealt with the appellate proceedings also. I do believe Mr. Wood has been in touch with him, though, and you can discuss it with him. But as far as the government sees, he cannot legally remain here. He has two convictions, and he has a finding of inadmissibility. So there is no way under the statute that he can stay here unless the agency decides, and even so, he may need to seek the waiver, which is also discretionary. But the fact is ---- Is there anything, nothing by having this pending in the court of appeals would have prevented him from seeking the waiver contemporaneously, correct? He can do anything he wants. He can do that, and there's nothing just because it's on appeal that means ---- No. Even if there's a final ruling, he can still go back and ask for it. But, again, he has had the advantage of living in this country for 20 years, most of the time by his request or for his benefit, and not if the government happens to ask. And this is all based on an ---- We can't blame him for that. I can't blame him, Your Honor, but the point is ---- I mean, he's here. He's here. His wife's here. She's a citizen. What are we going to do, throw him out and have him wait 20 years to come back to be with his family? Your Honor, other families have been divided with more equities. I know, and that's a shame on this country. It is a shame on the country, but that is presently the state of the law, Your Honor. Yeah, yeah. And I agree, and that's why we're ---- The government, under the Attorney General and President and the Secretary of Homeland Security, they're taking all these steps to benefit persons in similar conditions, but the people who benefit do not have criminal conviction. That is pretty much a no-brainer, and that disqualifies him. He has two convictions here, both of which he denied, by the way. He was not asked how many convictions do you have. He was asked how many arrests in the United States, and he said one when he actually had two, and then he lied about the substance of them, which in his brief he says, well, maybe I was embarrassed because I didn't want my wife and my mother-in-law to hear what the basis was. You know, he never suggested that. If that's suggested for the first time in the brief, the courtroom could have been cleared. The point is he did lie on the record. Well, he kind of lied, and then under cross-examination he kind of fesses up. Well, he has to when he's presented with the violation. Yeah, but he was slow to fess up. That's very clear from the transcript. Yes, but when he's faced with we have the fact, and when it was read out to him, he said, yeah, I guess I was convicted for that after all. But also, you know, going back to the initial application, you know, he's been here 20 years on the fact that he lied in 1991. As Your Honor pointed out, there's a big difference when you say I was threatened with arrest, I was arrested, I was detained. And the level, even if you believe the second story, which, by the way, the immigration judge was not required to do. He has two stories in the record. He can believe either one. Petitioner was not prevented from giving an explanation, but the immigration judge was not required to believe that explanation. And there's a big difference between saying I was threatened with arrest and with saying I was detained for four hours one time and for 18 hours another time and beaten. And then somewhere in the brief it says, you know, the point is made that it wasn't so bad that it would qualify as persecution. It was two brief detentions. There was some physical harm, but no instruments were used, no additional. It was done with hands. And it was treated with cold compresses. And in the brief it suggests that perhaps he wouldn't have been allowed in the hospital. These arrests took place where again? In Armenia in 1989, 1990. I beg your pardon? Yeah. Okay. Well, that's what they do in those places. That's what they did in those places for people. They still do it in those places. For different reasons, Your Honor. There is nothing to indicate that in 2012 he would be persecuted for any of the beliefs he now holds. I mean, things are not ideal in Armenia, but there is nothing to indicate. No, but they're very bad. They're very rough over there. Yes, but that's general conditions of violence. He has to point out how he would be separate from the general population and targeted for persecution, and he has not done so. I mean, the most this Court can do would be what the First Circuit did, and I've discussed this case with Mr. Wood. We talked about all the cases we would possibly bring up today. The First Circuit case of Gasparian, which was another Armenian family, that they actually had a final order of removal and was never acted on for 11 years. And then they filed a motion to reopen, again on changed country conditions, and the Court was annoyed because finally they're brought to the attention. They would never, DHS would never have known about it had they not filed the motion to reopen, but they also, and so First Circuit didn't like that. And they also. Well, how did this gentleman come to the attention? During the course of process, he was not a high priority, and eventually they got to his face and put him in proceedings. Well, who filed his application for him? For. Hi. Who was the lawyer that he had? It wasn't a lawyer, I don't think. It wasn't a lawyer. I don't think so. Oh, he didn't have a lawyer. Who was it? Does it have a name? Well, he doesn't indicate that somebody helped him with it. Well, one of those notorious helped him with it. We don't know that, Your Honor. Listen, I've been around listening to these cases for years. I know what goes on. And with Armenians and where they go seek their advice and the way they're treated and the people that give them this advice who are non-lawyers and exploit them. Well, that may be. There's a lot going on. There may be a lot going on. A lot going on that our government tolerates. You understand that? Yes, but there's nothing to indicate. We know those things go on. We don't do anything about it. We even allow, or we did for a long time, a disbarred lawyer, a disbarred lawyer, to represent a client in the immigration court. As well they should, and several disbarments have taken place in this court. But there's nothing to indicate that that took place here. The asylum application here very much parallels the case, his testimony at the hearing. There's nothing made up or that deals with anybody else. The only difference is whether he was arrested or threatened with arrest, but otherwise it pretty much tracks his claim. And he doesn't indicate that somebody else did it for him. That would have helped this court to reach a determination. But basically what this court can do is no more than the court did in the First Circuit where there were two more advantageous factors. One, that the aliens themselves had sought reopening 11 years later, and two, they had a son who came in when he was less than four years old and who was eligible for several forms of relief, possible forms of relief, and the court stayed the mandate for them to seek. The case is Gasparian, and it came out last week. But the point is, legally at this point, there is no way for this person to adjust. He does have a United States citizen wife. He can seek to have his convictions overturned. He can ask for a 212 waiver. But these are all discretionary considerations. Legally, there is no statutory means for him to avoid removal. What does he have to do to get his convictions overturned? Well, that's a state court matter, criminal state court matter. And his – he would have to find an attorney to try to do that for him. And it may or may not affect the immigration process. That is something his trial criminal attorney would have to determine. But legally, the government has done nothing wrong in this case. He did not have a credible claim for asylum. The immigration judge's decision was supported by substantial evidence, and he is legally inadmissible to this country. There are things he can do to take care of it, but right now, there's no way, unless you're going to find him – he had a credible asylum claim and had a credible claim of past persecution, a well-founded fear of persecution, which the government does not concede is the case here. The court cannot remand him order of granted relief. He is just inadmissible and ineligible for that relief. And one can hardly say that it's a disadvantage to him to have lived in the United States for the past 20 years. He's always been under the threat of removal. And most of his family remains in Armenia. His wife remains here. She was given a grant of cancellation, which I'm happy to be able to bring to this Court's attention because I know the Ninth Circuit doesn't think anybody ever gets relief from DHS. But, yes, his wife did get a grant of cancellation. I'm sorry? His wife did get – It's just a pleasure to be able to bring to this Court's attention, on the record, that there have been grants of relief of cancellation, which are – Exactly. So in this case, you have a couple here. The wife gets relief. The immigration judge doesn't want to divide a family any more than you do. But in this case – But in this case, it was warranted. Yeah. I don't know. It's a tough call, Your Honor, but that's the state of the law, and the ways around it are not within the jurisdiction of this Court to grant, with all due respect. And I do mean that. You're very cheerful. Thank you. I'm happy to be here, Your Honor. Thank you. No further questions? No. You got any ideas? I might have just a brief rebuttal, Your Honor. I'd like to bring to the Court's – Your Honors, if I could bring to the Court's attention – Did you know who gave him legal advice? You know, looking at the administrative record, it looks like it was prepared by, like you said, a paralegal or a friend. He testified that somebody prepared it for him and that he did not fill it out himself, the asylum application. The signature doesn't even look like it's his name, not even close. The other person may have even signed it. I think that's 257 of the administrative record. That's never been an argument, has it? Well, it is in the sense that – No, I'm asking you, is there anywhere in the record to the IJ or elsewhere that somebody else filled it out and he didn't sign it? I know he argued that he didn't understand English, but – Well, I think he – as I read his testimony, he actually had someone else fill it out for him. I don't think the signature part was actually discussed at the hearing. I will concede that. It didn't get to that level of detail, but he did say that someone else helped him fill it out, and as I read that, they actually wrote it out for him, being able to actually write the English characters, which Mr. Manassian could not. As far as other evidence from Mr. Manassian to adjust his status, I would like to just point out to the Court, and I'm sure counsel for the government can confirm this, that he did make a motion to reopen with considerable evidence. I understand that's discretionary, but that was denied. He also made an application, I assume his wife made it on his behalf to adjust his status based on her status. That also was denied. So he has taken steps to obtain – That's denied because of his convictions? Well, I'm not sure. Ostensibly, I don't know if it was or not, but certainly the government has discretion. Do you know? That I do not know. Because I think if you look at the immigration law, because of convictions, he couldn't come in under his wife in an automatic sense like one might hope. Right, so they have discretion. So he made a request – So they don't have discretion if he has convictions, then he has to have a waiver, I believe.  Do you know if he's applied for a waiver? No, I do not. I do not know that. My understanding was his best avenue would be the motion to reopen, which he spent considerable effort in making, and the government denied that. And obviously since it was made years later rather than the deadline, which I believe is 60 or 90 days, obviously they had discretion to do so. I might add once again that even though we argue this case doesn't require remand, because we do believe that there is evidence of what the current conditions are in Armenia and what Mr. Manassian would suffer if he were to return, because recall he wasn't just protesting the Soviet Union, he's protesting Russian influence in Armenia. And there still is considerable debate in Armenia, and there are opposition parties who oppose, for example, the fact that the borders are patrolled by Russia, and Russia maintains bases in the country, et cetera, et cetera. I think we've provided evidence that indicates that he would suffer future persecution were he to return to Armenia, and we did argue remand would be unnecessary. However, in the alternative we would argue that certainly he would be entitled or we would argue he'd be entitled to remand in the court's discretion, because he didn't get to present his full case, and he would have testified as to the country conditions, he would have testified as to the political views he has and what he would be involved in were he to return to Armenia, but that was the part of the hearing that was cut short. Is there any part of the hearing that was cut short that would go to the credibility issue? I don't see it, but I want to make sure you get a chance to tell me that something else would have come forward that would have helped him on the issue of credibility. I don't think on those questions that I.J., as he did on other questions, said, quote, next question, and literally cut someone off in the middle of the sentence. However, he basically announced his determination at the hearing that he was not finding Mr. Manassian was credible. So at that point, I don't know what good it would have done to present any additional evidence. Once Mr. Manassian explained that he did not equate his arrest with a conviction that he misunderstood, and basically he explained that he did community service, so he considered that as basically his get out of jail card. It may be an incorrect statement of California law, but nonetheless, I believe it was genuine when he's explaining that. Once he said that, the judge basically said, we don't believe you, we don't buy that. And at that point, he wasn't able to present anything further. Well, there's no further questions, I think, Your Honor. Did he have counsel with that? Yes, he did have counsel. Not at the time of the asylum application, of course. A friend, which as Your Honor pointed out, may have been a paralegal, helped with. But he did at the actual hearing before the I.J. Who was that? I'd have to check the record. It was not the lawyer who prepared the motion to reopen, which I must say was actually fairly well done, very detailed. I was a little bit surprised that even given the government's hardline position in this case, I was still surprised they didn't really give it more consideration. But the counsel who did the hearing before the I.J. certainly did not do a good job. I think there's no doubt about that. I could look in the AR really quickly. You have to use the microphone. Yeprman, Y-E-P-R-A-Y-A-N. I'm embarrassed by my pronunciation of Armenian names. Let me restate that. It's Yeprman, again. So it's Y-E-P-R-E-M-Y-A-N. That's the last name. I'm sorry, Y-E-P-R-E-M-Y-A-N. And that's the last name. So I can dispel the first name as well? Yeah, Bremian. What's his first name? It's Vahan, V-A-H-A-N. Vahan. And Mr. Manassian freely concedes his counsel did not perhaps do him full justice. Certainly I think folded, if I can use a vernacular term, basically folded when the immigration judge cut him off, where I think maybe a more diligent counsel would have put on the record maybe an objection that you need to provide more evidence. Well, thank you, Your Honor. Thank you. Well, thank you, Mr. Woods, for your pro bono work. The court appreciates it. All right, that concludes this matter and the court will recess.
judges: Pregerson, McKeown, Fletcher